### GAS AND OIL LEASES WITHIN THE STATUTE OF FRAUDS.

Circuit Court of Cuyahoga County.

JOHN B. COFFINBERRY v. H. W. BLAKESLEE.

Decided, May 18, 1908.

*Conflict of Laws—Statute of Frauds—Presumption that Interpretation of Statute of Another State same as in Ohio—A Partnership Agreement to deal in Oil and Gas Leases Must be in Writing—Statute of Frauds Complied With if all the Terms of an Agreement Appear in Signed Correspondence.*

1. Where it is shown that the statutes of a state in which a contract was made are the same as the statutes of Ohio, it will be presumed, in the absence of any evidence on the subject, that the decisions under those statutes are the same as the decisions in Ohio.

2. In Ohio a partnership agreement made for the purpose of operating in oil and gas leases is within the statute of frauds and must be in writing.

3. Several writings, though made at different times in the form of letters, may be construed together, for the purpose of ascertaining the terms of a contract required, by the statute of frauds, to be in writing.

*Whitney, Johnson, McCaslin & Cannon,* for plaintiff.
*W. C. Ong,* contra.

HENRY, J.; WINCH, J., and MARVIN, J., concur.

In this appeal the plaintiff seeks an accounting from defendant of profits of an alleged partnership formed with him about January 10, 1901, to deal in oil leases in and about Beaumont, Texas. Some agreement was admittedly entered into between the parties

at Fort Worth, Texas, about that time. The plaintiff, Coffin-
berry, was sojourning in that city in the employ, as right-of-way
agent, of a Cleveland traction syndicate, who were then building
an electric road in Texas. The defendant, Blakeslee, a lawyer
and oil operator, was in Texas on a hunting trip, and a day or
two after the great oil strike in Beaumont they met at a hotel
or boarding house in Fort Worth. They had had previous deal-
ings together. Plaintiff then and there called to defendant's at-
tention a newspaper report of the Beaumont oil strike. After
talking the matter over, defendant started promptly for Beau-
mont, pursuant to an agreement which plaintiff claims provided
that defendant was to give his whole time and attention to the
business, receive a salary of $5 a day and expenses, and furnish
three-fourths of the funds necessary for acquiring oil leases and
for carrying on the business of the partnership; plaintiff on his
part to furnish the other one-fourth of the funds of salary and
expenses, and the profits and losses of the partnership to be di-
vided between them in the ration of three-fourths to defendant
and one-fourth to plaintiff.

Defendant's version of the understanding is that because of
certain inducements held out to him by plaintiff in respect to a
division of expected commissions from a real estate deal connect-
ed with the traction enterprise, he offered to let plaintiff in with
him to the extent of a quarter interest in such leases as he might
thereafter acquire in Beaumont, and think proper to share with
plaintiff.

The plaintiff insists that the partnership arrangement in re-
gard to dealing in oil leases, had no connection whatever with the
traction real estate deal. The latter, he claims, was as follows:

Part of a certain property known as the Handley farm was
wanted by the traction company for park and other purposes in
case certain pending legislation affecting that feature of their
business should become a law. In order to get what the traction
company required, it was necessary to take the whole farm, and
plaintiff expected that the residue, which would be rendered very
valuable in case the traction company used the part it required
in the manner contemplated, might be so handled as to realize
to him a commission of $800 or $1,000 and possibly other profits

in addition thereto, through the organization of a real estate company and the sale of lots.

In talking the matter over in Fort Worth with defendant, plaintiff sought and obtained the latter's permission to use his name as that of the real purchaser, whom plaintiff represented in his negotiations for the acquisition of the Handley farm. This ruse was to be resorted to, to prevent the seller from raising his price, as it was expected he would do if he were informed that the traction company was the purchaser. The plaintiff actually took an option in defendant's name, but through failure of the pending legislation the traction company permitted it to lapse. Later on, however, it was renewed in plaintiff's name and the property taken over by the traction company. Plaintiff was at that time working on a salary for the traction company, and as now appears, he never realized his expectations of profit from the Handley deal. So at least we find from all the evidence.

Defendant, within a month or two after arriving at Beaumont, acquired a number of valuable oil leases out of which over $25,000 profit was derived. He kept up, meanwhile, a constant correspondence with plaintiff, the whole of which, taken together, is very voluminous. It is written in a very friendly, intimate and colloquial style, intended evidently to be humorous. It became evident, however, that as soon as defendant's large success was assured, he did not wish to divide with plaintiff on the basis then and now claimed by the latter. Much is said about the fading prospects of profit from the Handley deal, and defendant intimates more and more pointedly that he intends that plaintiff's participation in the profits of the oil deals shall depend very largely on his payment of at least $400 to defendant, being one-half of the expected profit from the Handley deal. Finally on April 9th, defendant plainly exercises his undoubted right of terminating the partnership unequivocally. In the meanwhile, however, on January 13, 1901, at the very inception of the enterprise, defendant had written to plaintiff, expressly recognizing the existence of some agreement between them respecting his dealing in oil leases, for he speaks of enlarging their enterprise so as to include dealing in vacant property, and says "Of course you would be in that same as oil leases," etc.

On January 17, 1901, defendant writes to plaintiff saying: "Send me a draft at once for $625. I will send you a check at once in return for $500 and a receipt for $125 on all of your one-quarter costs and expenses."

On February 9, 1901, defendant writes "We couldn't hire a man to do what I did yesterday and today for $50 and I get $10 for it," referring plainly to his per diem of $5.

On February 19, 1901, defendant wrote a letter clearly recognizing the terms of the original agreement as claimed by plaintiff, except the Handley feature, which he still insists was a part of the agreement, but which in the aspect it had then assumed, he accepts. In his usual whimsical vein the defendant writes of an alleged meeting between himself and the field man, who was none other than himself, as the entire correspondence clearly discloses. He says, "We held a meeting at my office late last night and the field man said we were probably being worked some on that commission, but as the chances are so strong that there won't be any commission to divide, that he would move to have the report accepted and spread upon the minutes of the meeting, also on the books of the company, and that our share be accepted as offered, viz: $400 out of the $886 and that we declare the original compact as to your having one-fourth of the profits, if any, and stand one-fourth of the losses on all deals, commissions, etc., made by me in this field, and that we furnish you as soon as convenient a receipt for the $125 you have paid in and a statement of the terms on which you are in, so that nothing can be construed to tie up, hamper or hinder the free and full control of all business by our most worthy and competent field man, whose name modesty forbids me to mention."

As a matter of fact, plaintiff's letters to defendant, to which this was the reply, contained no outright offer to pay defendant $400 at all events, but only an offer to pay $400 out of the $886, commissions which plaintiff expected to realize out of the Handley deal.

On February 11, 1901, plaintiff had written defendant:

"I have paid $100 down on the Handley farm and am having abstract made out and if bill becomes a law will close at once. Will take deed in my own name as trustee. The company will

want about 200 acres of it. Will have to let that go at cost, expect to get $2 per acre commission on balance of 440 acres.''

On February 16, 1901, plaintiff wrote:

''I had concluded some days since to allow our field man $400 out of the $886 if he made an early report and made it full.''

This was the proposition then which the defendant accepted and in connection with which, as thus understood, he re-affirmed the original compact, which his letter shows that now, at least, both parties in all respects understood alike.

It would be profitless to review the entire correspondence in detail here. Suffice it to say that it does not in any particular disagree with the statement thus made of the business relations of the parties.

The defendant's explanation of this letter in his oral testimony, on cross-examination, is as follows:

''Q.  We held a meeting at my office late last night, and the F. M. said we were probably being worked some on that commission, but as the chances are so strong that there won't be any commission to divide that he would move to have the report accepted and spread upon the minutes of the meeting, also the books of the company and that our share be accepted as offered, namely, $400 out of $886. What company was that? A. There was no one there but myself. I was there as my field man and considered some letter that he had probably written, in which he might have offered the $400.

''Q.  At that time you had gotten Mr. Coffinberry's letter of February 16th which seemed to have satisfied you in regard to the street railroad matter, hadn't you? A. I had gotten that letter, and I considered it in a favorable light.

''Q.  So you go on and say that at that meeting this further took place, 'And we declare the original compact as to your having one-fourth of the profits or any, and stand one-fourth of the losses of all the deals, commissions, etc., made by me in the field.' Was that the original compact that was made? A. No, sir.

''Q.  Why didn't you say so in this letter then? A. I meant by that, that according to the original compact of one-fourth and expenses—I meant if he would give me that $400 it would be satisfactory and I'd declare him in on the whole thing according to the original compact that he was in on the ground floor.  I was

willing to extend it to all of them according to the compact we made as to what he was to have.

"Q.   So you intended in this letter of the 19th to advise Mr. Coffinberry that he was in with you for a fourth of all the deals you had made?   A. I intended to say I'd let him in, but later I said if he paid over that commission—in the same letter.   I wanted him to pay something on what he owed me.   I was trying to get him worked up to that."

This explanation does not appeal to us as at all satisfactory. The letter, jocular though it is in its style, is clear enough to show with what had previously been written by the parties to one another, that however doubtful the realization of any commission whatever from the Handley deal might be, defendant was content to accept $400 out of the $886 which plaintiff still hoped to realize therefrom, and with that solution of their differences the original agreement was re-affirmed, namely, that plaintiff should have one-fourth of the profits if any, and stand one-fourth of the losses on all deals, commissions, etc., made by defendant in the Beaumont oil field, the receipt of $125 to apply on plaintiff's share of defendant's salary of $5 per diem and other expenses being expressly acknowledged.  This re-statement of the understanding of the parties, to our minds, absolutely excludes any such limitation thereon as defendant now claims, but makes their partnership agreement applicable to all of the defendant's dealings in oil leases in the oil field in Beaumont.

The testimony produced for the first time in this court when taken in connection with the facts as disclosed by the letters of the parties, does not suffice to discredit the plaintiff's claims in this behalf.

The deposition of the witness Price can not be allowed to contradict the statements and implications of defendant's letter of February 19, wherein he wrote, in addition to what has already been quoted:

"You remember Price mentioned 100 acres south of the railroad at Amelia.   Our astute field man made a note of the name of the owner, namely, W. J. Collier, and said to us that he would have that piece of land, and the way to get it was by a bluff that

he would not test the land out there unless they put in enough worth while. Those tactics worked, nothing else would."

The plaintiff's testimony in reference to meeting Mr. Price and the conversation that ensued is thus entitled to credit in preference to the testimony of the defendant and Price himself denying the same and giving a wholly different version of plaintiff's statements. So also with respect to the deposition of one of the members of the brokerage firm of Ross and Newland to the effect that they never had any difficulty with Mr. Blakeslee and that Mr. Coffinberry never helped to straighten out any such difficulty. The documents in the case strongly indicate the contrary:

"BEAUMONT, TEXAS, April 25, 1901.
MR. D. S. ROSS and MR. NEWLAND:

"If you will bring me a customer that will take my 99-acre lease and pay me $15,000 in cash net, and bring said customer at five o'clock April 26, 1901, I will assign him all of my right, title and interest in the same for the said $15,000 net, with no commission to you. I will give the purchaser until noon Saturday to approve abstract if 10 per cent. of purchase money is paid on or before five o'clock Friday evening, April 26th, to bind bargain.

"If you can not find such purchaser by the time stated, then this deal is off and everything is even and settled between us and you have no claim for commission or other claim against me.

"(Signed)    H. W. BLAKESLEE,
"D. S. ROSS,
"W. V. NEWLAND.


"4-26-1901.

"Received of H. W. Blakeslee, $2,500 in full of our commission on the deal for the above property this day made, and in settlement of all claims on him.

"D. S. ROSS,
"W. V. NEWLAND.

"Witness to signature,
"J. B. COFFINBERRY."

On the whole evidence we reach precisely the same conclusion on the issues of fact as did the court below, namely, that the plaintiff is entitled to the accounting that he asks and to a de-

cree awarding him one-fourth of the $25,000 and upwards of profits realized by defendant.

The only question of law in the case concerns the application of the statute of frauds to partnership agreements for the purpose of dealing in oil leases, or other interests in land. It is perhaps true in Ohio, contrary to the weight of authority in other jurisdictions, that a partnership agreement for dealing in oil leases or other interests in land, must, under our statute of frauds, be in writing. The Texas statute is conceded to be like our own, and in the absence of evidence as to its judicial construction in that state, we must presume that it would be construed in accordance with Ohio decisions. *Watson* v. *Erb*, 33 Ohio St., 35, seems to be in point, and in the opinion of the court by Johnson, C. J., it is said at pages 48-49 that:

"A parol agreement that another shall be interested in the purchase of lands or the declaration that he buys for another, where no money is advanced, comes directly under the statute of frauds."

But it is also held in Ohio that:

"A contract falling within the statute of frauds may be enforced, if plainly made out in all its terms, from any writing of the party, or even from his correspondence," although "it must all be collected from the writings, verbal testimony not being admissible to supply any defects or omissions in the written evidence." *Williamson* v. *Hall*, 1 Ohio St., 190; *McGoveney* v. *State*, 20 Ohio, 93.

And in *Thayer* v. *Luce*, 22 Ohio St., 62, the first two paragraphs of the syllabus are as follows:

"1. Several writings, though made at different times, may be construed together, for the purpose of ascertaining the terms of a contract required, by the statute of frauds, to be in writing and signed by the party to be charged therewith.

"2. If some only of such writings be so signed, reference must be specifically made therein to those which are not so signed but if each of the writings be so signed, such reference to the others need not be made, if, by inspection and comparison it appear that they severally relate to or form part of the same transaction."

In the same case it was said by McIlvaine, J., at page 75:

"It is well settled that a writing, relied upon to take a case out of the operation of the statute, may be executed after the verbal agreement is complete and at any time before action brought." .

The quotation I have made from the correspondence of the parties in the case before us, clearly show that an agreement was entered into between them, and that the terms thereof were substantially as claimed by the plaintiff. The evidence shows that the plaintiff never received any commission or profits out of the Handley deal, so that we need not consider whether or not a division of such profits was a part of the partnership agreement with respect to oil leases. If no profits were made, it is evidenced that defendant acquiesced in plaintiff's statement, clearly made in the course of the correspondence, that none were to be divided.

The alleged want of equity in plaintiff's claim, in that he contributed but $125 towards the expense of defendant's very large business operations at Beaumont, is of no moment, in view of the defendant's admission, in his testimony, that it was practically one-quarter of the whole amount which was required to be advanced before the business became self-sustaining.

The evidence does not support the claim that this contribution of $125 was intended by plaintiff, or received by defendant, as applying only to a part of defendant's dealings in oil leases, and even if the memorandum in writing sufficient to satisfy the statute of frauds could not be gathered from the correspondence of the parties, this contribution of $125 towards the expenses of the enterprise would entitle plaintiff to relief in equity.

On the whole case we find the equities with the plaintiff and he may take a decree as in the court below.